# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE | § | CASE NO. 20-11525 |
| | § | |
| LORRAINE MAE HYDE, | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | SECTION A |

## MEMORANDUM OPINION

Before the Court is the *Chapter 11 Small Business SubChapter V Plan*, [ECF Doc. 58], filed on behalf of the Debtor, Lorraine Mae Hyde, and the amendments thereto (as amended, the "Plan"), [ECF Docs. 81, 92, 115, 116, 149, 172 & 173]; the *Response and/or Objection of Clayton Law Firm, LLC To Plan of Reorganization Under Subchapter V*, [ECF Doc. 121], filed by the Clayton Law Firm;[1] the *Objection*, [ECF Doc. 122], filed by interested party Ryan Stumphauzer (the "Receiver");[2] the *Objection to Confirmation of the Plan*, [ECF Doc. 124], filed by Creditor River Ventures, LLC ("River Ventures"); and the *Objection to Confirmation of the Plan*, [ECF Doc. 125], filed by Creditor RJ's Transportation.

On January 28, 2022, this Court held an evidentiary hearing to consider these matters (the "Hearing"). Afterward, the Court issued an Order identifying the exhibits admitted into evidence and allowing the filing of a post-trial brief on the issue of good faith and feasibility. [ECF Doc. 171]. At the instruction of the Court at the Hearing, the Debtor filed the *Fourth Modified Plan of Reorganization Under Subchapter V Dated Monday, February 7, 2022 Filed by Lorraine Mae Hyde* and a red-lined version of the Plan.[3] [ECF Docs. 172 & 173]. On February 11, 2022, the

---

[1]     This Response was withdrawn on January 19, 2022. [ECF Doc. 159].

[2]     This Objection was resolved with the Agreed Order, [ECF Doc. 152], memorializing the agreement between the Debtor and the Receiver.

[3]     Although the Debtor titled the plan the "Fourth Modified Plan," this is the fifth modified plan filed by the Debtor. The Plan as presented during the Hearing did not include the necessary default provisions

Court issued an Order taking the matter under submission.  [ECF Doc. 175].  On April 7, the Court granted the Debtor's Ex Parte *Motion To Supplement the Record*, which supplemented the Debtor's record with notification of the dismissal of the criminal matter pending in state court against the Debtor.  [ECF Docs. 184 & 186].

After considering the pleadings, the exhibits introduced into evidence, the testimony and demeanor of the witnesses, the record in this case, applicable law, and the arguments of counsel, this Court **OVERRULES** the remaining objection and **CONFIRMS** the Debtor's Plan.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334.  The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(L).  The venue of the Debtor's chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FINDINGS OF FACT[4]

### A.  The Debtor's Bankruptcy Filing and Post-Petition Activity

Prior to filing for bankruptcy relief, the Debtor principally earned income through a wholly owned limited liability company, Genesis Venture Logistics ("GVL").  GVL operated pursuant to several government and state contracts, but on August 7, 2020, GVL filed a voluntary petition in this District under subchapter V of chapter 11 of the Bankruptcy Code (the "GVL Case"), but that case was converted to chapter 7 on June 21, 2021.  *See In re Genesis Venture Logistics*, No. 20-

---

required by the Bankruptcy Code and, at the Hearing, the Court granted the Debtor leave to amend the Plan to include those remedies.  *See* 11 U.S.C. § 1191(c)(3)(B).

[4]      These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.  To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law.  To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

11419, ECF Doc. 287.  The Debtor followed suit and on August 31, 2020, filed for bankruptcy relief under subchapter V of chapter 11 of the Bankruptcy Code, principally to deal with her guarantor liability for GVL's debts.  [ECF Doc. 1].

In her Schedules, the Debtor lists her primary assets to be: (a) a residential lot and home located at 7101 Edgewater Drive, Mandeville, Louisiana, encumbered by a mortgage from Rocket Mortgage, LLC (the "Home"); (b) a 2017 GMC Sierra (the "Sierra"); and (c) a 2016 GMC Yukon (the "Yukon").  The Debtor valued the Home at $472,000, the Sierra at $27,000, and the Yukon at $39,025.  [ECF Docs. 32 & 172].

According to the Claims Register, 17 proofs of claim have been filed against the estate in this case.  On September 25, 2020, Rocket Mortgage filed a proof of claim asserting a claim of $228,046.25 secured by the mortgage on the Home; it later amended its proof of claim on October 20, 2021, to assert a secured claim of $260,170.75.  On October 1, 2020, Citizens Bank & Trust Co. filed a proof of claim in the amount of $632,535.42; the basis for Citizen Bank & Trust's claim is the Debtor's personal guaranty of debts owed by GVL and secured by property held by non-debtor affiliate, Genesis Venture Investments, L.L.C.  *See* Plan Art. IV; Proof of Claim No. 9. General unsecured claims total an estimated amount of $2,277,821.96, of which objecting creditor River Ventures holds a $287,875.00 claim and claimant AmeriFactors Financial Group, LLC ("AmeriFactors") holds a $768,940.05 claim; both River Ventures and AmeriFactors, however, have been classified separately as discussed below.   Two priority unsecured claims have been filed:  one from the Internal Revenue Service for $6,529.30; and one from the Louisiana Department of Revenue for $1,000.

The Debtor filed her first plan of reorganization on November 29, 2020, and amended that plan on September 20, 2021, September 29, 2021, November 4, 2021, December 22, 2021, and again on February 7, 2022, after the Hearing.  [ECF Docs. 58, 81, 92, 115, 116, 149, 172 & 173].

**B.  The Debtor's Plan**

The Debtor has reduced her monthly expenses and proposes to fund the Plan using her income from Social Security benefits and part-time work, as well as her non-filing spouse's income.  *See* Plan § A.  If the Debtor receives any income from another source, including annual bonuses received by the Debtor's non-filing spouse, the Plan proposes that the Debtor shall apply 50% of any such disposable income to the Plan.  *See* Plan § A.

The Plan provides for the following treatment of claims:

Priority unsecured claims owed to the Internal Revenue service will be paid in full no later than thirty days after the effective date of the Plan.  *See* Plan § 7.1.

After application of any retainer by the holder of an administrative expense claim, allowed administrative claimants shall receive a *pro rata* share of $24,000 being held by the Debtor and her non-filing spouse from the refinance of their Home.  *See* Plan § 7.1.  Distributions to the remaining allowed administrative expense claimants will receive quarterly distributions of disposable income until paid in full.  *See* Plan § 7.1.

The Debtor's secured lender, Rocket Mortgage (Class 1) is deemed unimpaired, will retain its lien, and will receive full payments of the remaining balance of its secured claim per the terms of its agreements.  *See* Plan § 4.  As a guarantor, the Debtor will continue to pay Citizens Bank & Trust (Class 2) pursuant to its agreement with GVL and will retain its mortgage and assignment of rents related to the office building held by Genesis Venture Investments, LLC.

General unsecured claims are classified into three classes:  Class 4 consists of undisputed, noncontingent, and liquidated claims, estimated to be $2,227,821.96; Class 5 consists of River Ventures' disputed claim; and Class 7 consists of AmeriFactors' claim.  *See* Plan § 6.2(A).  The Plan estimates the total amount of general unsecured claims in Classes 4, 5, and 7 to be $2,227,821.96.  *See* Plan § 6.2(A).  Under the proposed Plan, Class 4 will receive a *pro rata* share of projected quarterly disposable income after the holders of administrative expense claims are paid in full.  *See* Plan § 6.2(A).  The proposed Plan estimates that the holders of Class 4 claims will receive a total distribution of approximately $135,300.80.  *See* Plan § 6.2(A).  Class 5 claimant, River Ventures, has two avenues of treatment under the proposed Plan.  If River Ventures voted to accept the Plan, its claim would be treated under Class 4 as a general unsecured claim and would receive a *pro rata* distribution.  *See* Plan § 6.2(A)(i).  Because River Ventures voted to reject the Plan, the Plan sets aside and reserves for the benefit of River Ventures an amount equal to the distributions to which River Ventures would be entitled if it had accepted the Plan, but does not provide distributions until the resolution of the dispute between the Debtor and River Ventures by agreement or Final Order.  *See* Plan § 6.2(A)(ii).  The proposed Plan states River Ventures will only receive a *pro rata* share of the Debtor's projected quarterly disposable income if the claim is allowed.  *See* Plan § 6.2(A)(ii).

Under the Plan, the Debtor (Class 6) will retain her interests in the property listed in the Schedules.  *See* Plan § 4.  AmeriFactors' claim of $755,357 is classified separately in Class 7 because AmeriFactors has an independent right of recovery against third party Dunham Price Group LLC.[5]  AmeriFactors will receive a *pro rata* distribution with the same treatment of Class

---

[5]     *See AmeriFactors Fin. Grp. LLC v. Dunham Price Grp. LLC,* No. 2019-4937 (14th JDC, Parish of Calcasieu).

4; however, AmeriFactors will reimburse the Debtor for any recoveries in excess of $755,357.00 against Dunham Price Group LLC in the GVL Case.  *See* Plan § 4.

The Plan proposes that the Debtor will make all Plan payments, even though the Plan is proposed to be confirmed on a non-consensual basis.  *See* Plan Art. VII.  According to the Plan, in the event of a default of those Plan payments, the Debtor and her non-filing spouse shall grant a second mortgage on their Home not to exceed $200,000 to be used for the benefit of holders of unpaid allowed administrative claims and the holders of allowed general unsecured claims.  *See* Plan § 8.10.[6]  The Plan states the Debtor shall have 35 days from the receipt of a default notice, received via e-mail and U.S. mail by the Debtor, her non-filing spouse, the Debtor's general bankruptcy counsel, the Trustee, and the United States Trustee, to cure any payment default.  *See* Plan § 8.10.  If the Debtor fails to cure the payment default, then: (a) the Debtor and her non-filing spouse may obtain financing necessary to satisfy the unpaid balance of projected disposable income to be distributed under the proposed Plan within 63 days following the end of the notice period; or (b) if unable to obtain the financing necessary, the Trustee may enforce the mortgage against the Debtor's residence up to the unpaid balance of the projected disposable income to be distributed under the proposed Plan for the benefit of holders of unpaid allowed claims and shall be entitled to reasonable compensation and reimbursement of costs.  *See* Plan § 8.10.

The Court finds that the Plan adequately provides the information required by § 1190(1) of the Bankruptcy Code, as it contains "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make

---

[6]     Although the Debtor included default remedies in the most recent iteration of her Plan, she did not fully explain how those default provisions would be implemented.  If the Debtor defaults on Plan payments, and she does not timely cure a default under the terms of the Plan, the Court will require that the United States Trustee's office reappoint the subchapter V trustee, who will then enforce the default provisions, require the Debtor to execute a second mortgage on the Home, and apply the proceeds of that transaction to the unpaid balance of disposable income to be distributed.

payments under the proposed plan of reorganization." The Plan further provides "for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." 11 U.S.C. § 1190(2).

### C. The Confirmation Hearing

At the Hearing, the Court considered testimony and documentary evidence as listed in this Court's Order of February 11, 2022. [ECF Doc. 175]. The Court granted Debtor's counsel's oral motion at the beginning of the Hearing to amend the ballot tabulation and introduce new exhibits due to the submission of additional ballots subsequent to the exhibit deadline. *See* Hr'g Tr. Min. 9:05:45–08:45. Those additional ballots were received from River Ventures (Class 5) and AmeriFactors (Class 7). *See* Hr'g Tr. Min. 9:06:15–08:20. As other objections to Plan confirmation had been resolved prior to the Hearing, River Ventures holds the sole objection to confirmation of the Debtor's Plan. *See* Hr'g Tr. Min. 09:10:30–11:20, [ECF Doc. 124].

The Debtor testified in support of the Plan. The Court found the Debtor to be a knowledgeable and earnest witness. She explained to the Court the events leading to the filing of the petitions in her personal bankruptcy case and that of her business, GVL. *See* Hr'g Tr. Min. 9:12:10–18:15. The Debtor formed GVL in August of 2016 as a marine services business, focusing specifically on barge services. *See* Hr'g Tr. Min. 9:12:45–16:25. In 2018, GVL lost a major contract when the counterparty to that contract filed for bankruptcy relief; as GVL had pre-paid for services, it suffered financial distress when it could not recoup its outlay. *See* Hr'g Tr. Min. 9:14:30–16:15. That financial distress caused the Debtor to seek bankruptcy relief on behalf of GVL in August 2020. *See* Hr'g Tr. Min. 9:16:15–30. The Debtor sought bankruptcy protection herself later that month. *See* Hr'g Tr. Min. 9:16:32–17:04.

The Debtor also provided testimony as to her income from Social Security benefits and her part-time work in home healthcare services. *See* Hr'g Tr. Min. 9:19:15–24:10, *see also* Hyde Exs. 1 & 2. The Debtor testified that although she has not earned income from GVL since the filing of the bankruptcy cases, her income has actually increased since the petition date. *See* Hr'g Tr. Min. 9:23:45–24:54. She testified that her household expenses have decreased through the efforts of the Debtor and her non-filing spouse, including, for example, refinancing their Home loan to lower their monthly payments. *See* Hr'g Tr. Min. 9:25:05–26:10. That refinancing allows the Debtor to pay the majority of the administrative expense claims and priority unsecured tax claims in a lump sum. *See* Hr'g Tr. Min. 9:26:25–29:10. Combined with her non-filing spouse's bonuses and income, the Debtor is confident that she will be able to make all proposed Plan payments. *See* Hr'g Tr. Min. 9:31:45–33:10.

In addressing River Ventures' objection to Plan confirmation, the Debtor asserted that GVL did not pay River Ventures prepetition for work performed under that contract because GVL had not been paid itself for work it performed under other contracts; she also asserted that she had not personally guaranteed payment of the River Ventures contract. *See* Hr'g Tr. Min. 9:29:30–31:25. The Debtor stated that both she and her non-filing spouse contributed upwards of a million dollars to GVL as it started experiencing financial difficulties in an effort to save the company to no avail. *See* Hr'g Tr. Min. 9:46:55–47:40. The Debtor further testified that, under her Plan, if she received any income from litigation involving any of her other wholly owned entities, she would pay half of that recovery to creditors under the Plan. *See* Hr'g Tr. Min. 9:54:00–55:00.

The Debtor's non-filing spouse, Thomas Hyde ("Hyde"), also testified in support of the Plan. *See* Hr'g Tr. Min. 9:56:05–10:09:59. Hyde is employed by Kinder Morgan as a Commercial Account Manager. *See* Hr'g Tr. Min. 9:57:02–40. He testified regarding his income from Kinder

8

Morgan and, based on his 2020 W-2 tax form, that he earned $247,105.46 in net wages in that tax year. *See* Hr'g Tr. Min. 9:57:26–59:04; Hyde Exs. 3 & 4. Hyde also testified that he had yet to receive his 2021 W-2 tax form, but anticipated that it would reflect similar income, if not slightly higher. *See* Hr'g Tr. Min. 9:57:30-59:15; Hyde Exs. 3 & 4. Hyde stated that he assisted in preparing the financial projections provided in support of the Debtor's Plan, including providing financial information need to estimate the Debtor's projected disposable income. *See* Hr'g Tr. Min. 10:00:22–01:33; Hyde Ex. 1. Additionally, Hyde testified that he has withdrawn funds from two of his separate pensions, Keiser Aluminum and Rubicon Inc., to increase the Debtor's projected disposable income. *See* Hr'g Tr. Min. 10:01:33–02:15.

Hyde explained to the Court that the Debtor and he refinanced their original note on the Home, thereby reducing their monthly payment from approximately $4,500 per month to $1,800 per month. *See* Hr'g Tr. Min. 10:02:40–03:18. He confirmed that the income and expenses prepared for the Plan accurately reflect their monthly financials. *See* Hr'g Tr. Min. 10:03:45–04:22; Hyde Ex. 1. Hyde also testified that the Debtor and he have the ability to make a lump-sum payment to both the Internal Revenue Service and the estate professionals in this chapter 11 case on the effective date of the Plan. *See* Hr'g Tr. Min. 10:04:45–05:23. Hyde confirmed that he is aware that he is the primary contributor to the quarterly payments under the Plan. *See* Hr'g Tr. Min. 10:05:30-06:10. On cross-examination, Hyde testified that he does not have current plans to retire, but confirmed that, if and when he does retire, he will receive an annuity that will allow him to continue making Plan payments, should any be due. *See* Hr'g Tr. Min. 10:08:53–09:26.

The owner of River Ventures, Jerry J. Hannah ("Hannah"), testified on behalf of his company and objected to the Plan's confirmation, questioning the veracity of the Debtor's financial disclosures and the good-faith basis of the Debtor's bankruptcy filing. *See* Hr'g Tr. Min.

10:11:25–23:47.  The record in the Debtor's case does not reflect that River Ventures pursued any discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure to examine the finances of the Debtor.  And although River Ventures filed a proof of claim in the Debtor's case, it attached as the basis for that claim a Complaint against GVL—not the Debtor—filed in the U.S. District Court for the Eastern District of Louisiana.  Paragraph 17 of the Complaint alleges that the Debtor "as the sole member of [GVL], exercised her control over the company to use the corporate identity of [GVL] to perpetuate fraud on River Ventures for her own personal benefit and to the detriment of River Ventures," and thus "the corporate debt of [GVL] to River Ventures should be imposed on [the Debtor] in her individual capacity."  In his testimony, Hannah conceded that no contract was executed between GVL and River Ventures, and that the Debtor executed no personal guaranty for any debt owed by GVL to River Ventures.  *See* Hr'g Tr. Min. 10:19:55–21:20.  The Court finds Hannah's testimony to be misdirected and, therefore, of limited usefulness.

## CONCLUSIONS OF LAW

Effective February 19, 2020, the Small Business Reorganization Act added new subchapter V provisions codified at 11 U.S.C. §§ 1181–1195, designed to streamline the reorganization process for small business debtors.  Section 1191 of the Bankruptcy Code provides the rules for confirmation of a plan filed in a subchapter V case.  Section 1191(a) requires that all of the requirements of § 1129(a) (other than paragraphs (8), (10), and (15)) be met.

### A.      The Debtor's Plan Satisfies All Applicable Provisions of § 1129(a).

#### 1.      *Section 1129(a)(1)*

Section 1129(a)(1) incorporates the requirements of §§ 1122 and 1123, governing classification and contents of a plan.  *See* H.R. Rep. No. 595, 95th Cong. 1st Sess. 412 (1977), S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978), U.S.C.C.A.N. 1978, pp. 5963, 5787, 5912, 6388.

The Court observes that the Debtor's Plan properly classifies claims and interests in accordance with §§ 1122 and 1123, as well as provides for the same treatment by the Debtor of each claim or interest in each respective class, thereby satisfying § 1123(a)(4).  Further, the Court finds that the Debtor has provided adequate means for the plan's implementation, thus satisfying § 1123(a)(5), which allows in pertinent part, "retention by the debtor of all or any part of the property of the estate."  11 U.S.C. § 1123(a)(5)(A).

2. *Section 1129(a)(2)*

Section 1129(a)(2) requires that the proponent of the plan comply with "applicable provisions" of the Bankruptcy Code, *i.e.*, disclosure and solicitation requirements, which are "the paradigmatic example[s] of what Congress had in mind within it enacted § 1129(a)(2)."  *In re Pearl Res. LLC*, 622 B.R. 236, 259 (Bankr. S.D. Tex. 2020) (citing *In re Trans World Airlines, Inc.*, 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995); *In re Texaco, Inc.*, 84 B.R. 893, 906–07 (Bankr. S.D.N.Y. 1988)).  Section 1129(a)(2) is essentially inapplicable in a subchapter V case, as a separate disclosure statement is not required, unless the Court so orders.  *See* 11 U.S.C. § 1187(c).

3. *Section 1129(a)(3)*

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  The Court concludes that the Debtor's Plan has not been proposed by any means forbidden by law.  As to the requirement of good faith, "the Fifth Circuit has stated that the requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind that the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."  *In re Pearl Res. LLC*, 622 B.R. at 260 (citing *In re Sun Country Dev., Inc*., 764 F.2d 406, 408 (5th Cir. 1985)).  Indeed, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope

of success, the good faith requirement of § 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d at 408.

Although River Ventures asserts that the Debtor proposed this Plan in bad faith, the Court finds that the Debtor has provided sufficient evidence by way of financial information and credible testimony to support a finding that her personal bankruptcy was filed in good faith. The evidence revealed that the Debtor's main source of income was the income she received from her wholly owned company, GVL. When GVL experienced cash-flow issues due to a series of cancelled contracts, she too experienced financial distress as the guarantor of GVL's debts and sought bankruptcy protection for both GVL and herself. Additionally, as discussed below, the Court finds that the Debtor provided sufficient financial information to support feasibility of the Plan, including evidence showing that the Debtor has taken substantial steps to increase her income and decrease her monthly expenses in order to provide higher projected disposable income to pay out creditors. The Court has been presented with no evidence to suggest that the Debtor filed this Plan in a means forbidden by law or in the absence of good faith. Thus, the Court overrules River Ventures' objection and finds that the Debtor has satisfied § 1129(a)(3) by a preponderance of the evidence.

> 4.      *Section 1129(a)(4)*

Section 1129(a)(4) requires that any payment made by the Debtor for services "in or in connection with" the plan or the case be approved by the Court as "reasonable." To date, the Debtor has disclosed and the Court has reviewed and approved pre-confirmation payments of fees and expenses. No party in interest has objected to the Plan based on § 1129(a)(4). The Court has reviewed the Plan and concludes that it complies with § 1129(a)(4)'s requirements.

5.      *Section 1129(a)(5)*

Section 1129(a)(5) requires that the Debtor's Plan disclose any individual proposed to serve "as a director, officer, or voting trustee of the debtor" and that the appointment is "consistent with the interests of creditors and equity security holders and with public policy." Here, the Debtor is an individual.  *See* Plan, § A.  The Court concludes that § 1129(a)(5) is inapplicable.

6.      *Section 1129(a)(6)*

Section 1129(a)(6) requires that "any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." That provision is not applicable here.

7.      *Section 1129(a)(7)*

The text of § 1129(a)(7), known as the "best interests" test, requires that each objecting creditor receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation of the debtor.  Any objection to the Plan on the basis of § 1129(a)(7) has been resolved. [ECF Doc. 152].  Nevertheless, based on the liquidation analysis provided by the Debtor, the Court finds that if the Debtor's assets were liquidated under chapter 7 of the Bankruptcy Code, the risk exists that a forced sale of assets would render reduced proceeds, leaving creditors with less than they would receive under the proposed Plan.  *See* Plan § B.  Therefore, the Debtor has satisfied § 1129(a)(7).

8.      *Section 1129(a)(8)*

Section 1129(a)(8) requires that each class of claims or interests accept the Plan or not be impaired under the Plan; that section, however, is one of three subsections of § 1129(a) that does not have to be satisfied for a subchapter V plan to be confirmed.  *See* 11 U.S.C. § 1191(b).

9.      *Section 1129(a)(9)*

Section 1129(a)(9) governs the manner in which unsecured priority tax claims must be paid unless the holder of a particular claim has agreed to a different treatment.  The Debtor asserts that it owes only priority unsecured tax claims under § 507(a)(8).  *See* Plan, § 3.03.  The Plan proposes to pay $6,529.30 to the Internal Revenue Service in full no later than 30 days after the Effective Date of the plan, satisfying § 1129(a)(9)(C).  *See* Plan, Art 7.  No party in interest has objected to the Plan's treatment of § 507(a)(8) unsecured priority tax claims.  Therefore, the Court concludes that the Debtor has carried her burden under § 1129(a)(9).

10.      *Section 1129(a)(10)*

Section 1129(a)(10) requires that at least one non-insider, impaired class of creditors has accepted the plan.  As stated above, however, § 1129(a)(10) does not have to be satisfied to confirm a plan in subchapter V.  *See* 11 U.S.C. § 1191(b).  Nevertheless, Class 4 (General Unsecured Creditors) is impaired and voted to accept the Plan.  [ECF Doc. 164 (Tabulation of Ballots)].

11.      *Section 1129(a)(11)*

The text of § 1129(a)(11), known as the "feasibility test," requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  For a plan to be considered feasible, "a debtor must demonstrate that its plan offers a reasonable possibility of success by a preponderance of the evidence."  *In re Pearl Res., LLC*, 622 B.R. 236, 263 (Bankr. S.D. Tex. 2020) (citing *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P-Ship (In re T-H New Orleans Ltd. P-Ship)*, 116 F.33d 790, 801 (5th Cir. 1997)).  "The bankruptcy court must make a specific finding as to feasibility after engaging in a peculiarly fact intensive inquiry that involves a case-by-case analysis, using as

a backdrop the relatively low parameters articulated in the statute." *Id*. (citing *In re Lakeside Glob. II, Ltd*., 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989); *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015)).

The Court finds that the Debtor has established a viable method of funding the plan through contributions from:  (i) the Debtor's non-filing spouse's income, pension withdrawals, and annual bonuses; (ii) the Debtor's Social Security benefits; (iii) the Debtor's income from part-time work; and (iv) a percentage of any surplus income that Debtor's other wholly owned, non-debtor businesses receive.  *See* Hr'g Tr. Min. 9:19:22–28:45, 9:58:15–10:06:03; Hyde Ex. 2; Plan § A, C, Art. VII, Ex. A.  Additionally, the Debtor's efforts to reduce her monthly expenditures through refinancing her Home loan and making lifestyle changes have significantly improved the likelihood of success for the Plan.[7]  Thus, based on the record in this case and the evidence provided at the Hearing, the Court finds that the Debtor has satisfied her burden to show not only that the Plan is feasible under § 1129(a)(11), but also that a reasonable likelihood exists that she will be able to make all Plan payments.  *See* 11 U.S.C. § 1191(c)(3)(A).

> 12.     *Section 1129(a)(12)*

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan."  The Debtor paid filing fees owed pursuant to 28 U.S.C. § 1930(a).  [ECF Doc. 2].  Payment of quarterly fees to the United States Trustee are not required under subchapter V.  *See* 28 U.S.C. § 1930(a)(6).  Thus, the Court finds that the Debtor has satisfied § 1129(a)(12).

---

[7]     The Court also notes that all criminal charges levied against the Debtor have been dropped, thus posing no impediment to her ability to earn income going forward.  [ECF Docs. 184 & 186].

13.     *Section 1129(a)(13)*

Section 1129(a)(13) requires that a plan provide for "the continuation after its effective date of payment of all retiree benefits," as defined and required in § 1114 of the Bankruptcy Code, "at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits."  That provision is not applicable in this case.

14.     *Section 1129(a)(14)*

Section 1129(a)(14) requires a debtor to keep current on any domestic support obligations "required by a judicial or administrative order, or by statute" that becomes payable after the Petition Date.  That provision is not applicable in this case.

15.     *Section 1129(a)(15)*

Section 1129(a)(15) requires that if the debtor is an individual and an unsecured creditor has objected to confirmation of the plan, the property to be distributed to that unsecured creditor must not be less than the value required by § 1129(a)(15).  But satisfaction of § 1129(a)(15) is not required to confirm a plan in Subchapter V.  *See* 11 U.S.C. § 1191(b).

16.     *Section 1129(a)(16)*

Section 1129(a)(16) is likewise inapplicable here.  That provision requires that all transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust.  *See* 11 U.S.C. § 1129(a)(16).

Based on the foregoing, the Court finds that the Debtor has satisfied all applicable provisions of § 1129(a).

### B. The Debtor's Plan Treats River Ventures' Unsecured Claim (Class 5) Fairly and Equitably.

"*Cram down* is a colloquial expression used in bankruptcy practice to signify confirmation of a reorganization plan notwithstanding the negative vote of a secured creditor class—the court figuratively crams the plan down the throat of the dissenting class." *In re Sunflower Racing, Inc.*, 219 B.R. 587, 590 (Bankr. D. Kan. 1998). Subchapter V does not change existing law regarding permissible cram down treatment of secured claims. If all applicable § 1129(a) subsections are satisfied, § 1191(b) requires that "the court, on request of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Section 1191(c)(1) simply adopts the existing rules found in § 1129(b)(2)(A) for permissible cramdown on secured creditors.

But § 1191(c) does not state a "fair and equitable" rule regarding unsecured claims. "Instead, it imposes a projected disposable income requirement ('best effort' test), which requires a feasibility finding, and requires that the plan provide appropriate remedies if payments are not made." *In re Pearl Res. LLC*, 622 B.R. 236, 265 (Bankr. S.D. Tex. 2020). Instead of the traditional chapter 11 absolute priority rule, a replacement "fair and equitable" requirement is implemented, similar to those found in chapters 12 and 13 cases. *See id.* The plan must provide for distribution of the debtor's projected disposable income over at least three years and up to five years from the date the first plan payment is due. *See id.* Under § 1191(c)(3), the Plan is fair and equitable with respect to each class of claimant if:

(A)     (i) the debtor will be able to make all payments under the plan; or

         (ii) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and

> (B)     the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

11 U.S.C. § 1191(c)(3).

The objecting creditor, River Ventures, asserts that the Debtor has not provided sufficient financial records to determine if the disposable income applied to allowable claims over a five-year period is adequate. [ECF Doc. 124]. The Court disagrees.

> 1.     *The Plan satisfies the disposable income test*

A plan under the cramdown provisions of § 1191(b) must satisfy the modified projected disposable income rule. 11 U.S.C. § 1191(c). This Plan must satisfy the requirement that the debtor apply all projected disposable income the debtor receives in a three-year period after the first payment under the plan is due, up to but not exceeding five years as the Court may fix. 11 U.S.C. § 1191(c)(2)(A). The Bankruptcy Code defines "disposable income" as:

> (d) . . . income that is received by the debtor and that is not reasonably necessary to be expended—
>
>> (1) for—
>>
>>> (A) the maintenance or support of the debtor or a dependent of the debtor; or
>>>
>>> (B) a domestic support obligation that first becomes payable after the date of the filing of the petition; or
>>
>> (2) for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor.

11 U.S.C. § 1191(d).

That definition of disposable income is similar to the definitions found in § 1225(b)(2) and § 1325(b)(2), except that § 1191(d) does not incorporate the means test into its calculations. *See In re Pearl Res. LLC*, 622 B.R. at 265; *see also* 11 U.S.C. §§ 1225(b)(2) & 1325(b)(2). The test for determining what maintenance and support expenses are "reasonably necessary to be

18

expended" in § 1191(d)(1) for subchapter V cases is the same as that employed in chapter 12 and below-median chapter 13 cases, and similar to the test in chapter 13 prior to the means test standards of the BAPCPA.  *See id.*

Here, the Debtor does not have any domestic support obligations that would fall under § 1191(d)(1)(B).  Additionally, the Debtor is an individual and § 1191(d)(2) does not apply.  The evidence shows the Debtor's only obligations that are applicable would fall under maintenance or support of the Debtor and Debtor's dependents.  Based on the additional testimony of the Debtor's non-filing spouse, Hyde, the Debtor has made every effort to reduce the maintenance and support obligations of the Debtor by reducing monthly expenditures, including the Debtor's refinancing of the note on her Home.  The Plan also provides that any additional income earned by the GVL businesses will have 50% of the excess funds applied to the Plan to pay out creditors.  When the Debtor's projected monthly income is compared to the Debtor's monthly household expenses, the Plan shows that all of the projected disposable income of the Debtor is being applied to pay creditors.

### 2.    *The Plan is feasible and provides remedies for default*

The Court must consider two additional factors provided by § 1191(c)(3) when determining whether the fair and equitable test has been met as to unsecured creditors.  The Debtor must provide evidence that she  can "realistically carry out its plan" and provide "appropriate remedies to protect the holders of claims or interests if the debtor does not make the required plan payments."  *See In re Pearl Res LLC*, 622 B.R. at 269.

Here, the Court finds that the testimony of the Debtor and Hyde weigh in favor of the Debtor's ability to fund the Plan.  The Debtor's testimony as to her income from her Social Security benefits, her part-time work, and her non-filing spouse's income and bonuses provide significant

evidence that the Debtor is committed to the success of this Plan and can realistically carry out the Plan. *See* Hr'g Tr. Min. 9:19:15–24:10; 9:31:45–33:10; *see also* Hyde Exs. 1 & 2. The Debtor's projected annual income of $162,120 leaves $22,730 of projected disposable income after annual household expenses of $139,390 are deducted, leaving roughly $1,894.17 of monthly disposable income to be distributed to creditors. *See* Plan Ex. A. The Plan proposes to pay, over the course of five years, the sum of $123,783.44 in present value *pro rata* to Class 4 General Unsecured Creditors, representing a 4.87% distribution to those creditors, which is a higher distribution than the 3.55% distribution reflected in the Debtor's liquidation analysis. *See* Plan § B & Ex. A.

The Plan also includes remedies to general unsecured creditors in the event of non-payment. [ECF Doc. 172]. To fully satisfy § 1191(c)(3)(B), the Plan contains a default remedy which requires the Debtor and her non-filing spouse to grant a second mortgage on their Home in the amount of $200,000 in favor of the Trustee for the benefit of Holders of unpaid allowed administrative expense claims and allowed general unsecured claims. *See* Plan Art. VIII § 8.10.[8] If the Debtor defaults on Plan payments and she does not cure the default timely pursuant to the terms of the Plan, the Court requires that the subchapter V trustee be reappointed as the Trustee who will enforce the default remedy, require the Debtor to execute a second mortgage on the Home, and apply the proceeds of that transaction to the unpaid balance of disposable income to be distributed. *Id*. Based on the evidence and testimony provided by the Debtor and Hyde and the Plan's default remedy, the Court finds that the Debtor's Plan meets the requirements of § 1191(c)(3).

---

[8] The $200,000 sum is sufficient to cover $123,783.44 to be disbursed to general unsecured creditors under the Plan as well as $25,699.20 to be paid to administrative expense claimants and priority unsecured claimants. *Id*.

## CONCLUSION

For the foregoing reasons, this Court overrules all remaining objections and confirms the Plan, [ECF Doc. 172].

An Order consistent with this Memorandum Opinion, confirming the Debtor's Plan and overruling all objections, shall be entered contemporaneously.

New Orleans, Louisiana, June 6, 2022.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE